# Exhibit   1

 **CT Corporation**

**Service of Process Transmittal**
12/27/2010
CT Log Number 517797994

**TO:**      Shelley Alleyne
Pricewaterhouse Coopers
PriceWaterhouse Coopers Center, 300 Madison Avenue
New York, NY 10017

**RE:      Process Served in Oklahoma**

**FOR:**   PricewaterhouseCoopers LLP (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Cottonwood Partnership, L.L.P., et al., Pltfs. vs. Pricewaterhouse Coopers, LLP, et al., Dfts.<br>*Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Original Summons, Petition, Affidavit |
| **COURT/AGENCY:** | In the District Court in and for Tulsa County, OK<br>Case # CJ-2010-08173 |
| **NATURE OF ACTION:** | Seeking compensatory and punitive damages and costs for Professional Negligence and Violation of the Oklahoma Accountancy Act - Pricewaterhouse Coopers, LLP failed to ensure that Kivisto's related party transactions and debt were adequately disclosed in SemGroup's financial statements |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Company, Oklahoma City, OK |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 12/27/2010 postmarked on 12/23/2010 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | James W. Rusher<br>Albright, Rusher & Hardcastle, P.C.<br>2600 Bank of America Center<br>15 West 6th Street<br>Tulsa, OK 74119<br>918-583-5800 |
| **ACTION ITEMS:** | CT will retain the current log<br>Image SOP<br>Email Notification, Patrice Edmonds patrice.edmonds@us.pwc.com<br>Email Notification, Ivan P. Stolze ivan.p.stolze@us.pwc.com<br>Email Notification, Shelley Alleyne shelley.alleyne@us.pwc.com<br>Email Notification, Andrew Plunkett andrew.plunkett@us.pwc.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | The Corporation Company<br>Amy McLaren<br>1833 South Morgan Road<br>Oklahoma City, OK 73128<br>800-592-9023 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

<u>ORIGINAL SUMMONS</u>

### IN THE DISTRICT COURT OF TULSA COUNTY
### STATE OF OKLAHOMA, 500 S. DENVER AVE., TULSA, OKLAHOMA 74103

COTTONWOOD PARTNERSHIP, LLP,
DUNBAR FAMILY PARTNERSHIP, LP, et al.,
               Plaintiffs

vs.

PRICEWATERHOUSE COOPERS, LLP,
THOMAS KIVISTO, and JOHN DOES 1-25,
               Defendants

Case No. CJ-2010-08173

Attorney for Plaintiff
James W. Rusher, OBA #11501
Albright, Rusher & Hardcastle
2600 Bank of America Center
Tulsa, Oklahoma 74119
Telephone: 918/583-5800

Pricewaterhouse Coopers, LLP
c/o The Corporation Company, Registered Agent
1833 S. Morgan Road
Oklahoma City, OK 73128

LINDA G. MORRISSEY,

**To the above-named Defendant**

Appointed to serve, PSL # _____

_____
Authorized by

    You have been sued by the above named plaintiff, and you are directed to file a written answer to the attached petition and summons in the court at the above address within twenty (20) days after service of this summons upon you exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff. Unless you answer the petition within the time stated judgment will be rendered against you with costs of the action.

    Issued this _22_ day of December, 2010.

Sally Howe-Smith, Court Clerk

By _____ , Deputy Court Clerk

(Seal)

This summons and petition were served on _____

_____
(Signature of person serving summons)

    YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THIS SUMMONS.

### Return ORIGINAL for filing.

47351.002

## IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
## STATE OF OKLAHOMA

COTTONWOOD PARTNERSHIP, L.L.P.,  )
DUNBAR FAMILY PARTNERSHIP, L.P.,  )
ROSENE FAMILY L.L.C.,  )
WARREN F. KRUGER, KATHERINE A.  )
KRUGER, DAVID S. KRUGER, AND  )
KATHRYN E. SHELLEY,  )
   )
          Plaintiffs,  )
   )
vs.  )
   )
PRICEWATERHOUSE COOPERS, LLP,  )
THOMAS KIVISTO, AND JOHN DOES 1-25  )
   )
          Defendants.  )

# CJ-2010-08173

LINDA G. MORRISSEY

Case No. _____

DISTRICT COURT

Judge _____ **FILED**

DEC 2 2 2010

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

JURY TRIAL DEMANDED

## PETITION

Plaintiffs, Cottonwood Partnership, L.L.P., Dunbar Family Partnership, L.P., Rosene Family L.L.C., Warren F. Kruger, Katherine A. Kruger, Davis S. Kruger, and Kathryn E. Shelley (collectively "Plaintiffs") bring this action against Defendants Pricewaterhouse Coopers, LLP ("PwC") for professional negligence and violation of the Oklahoma Accountancy Act, Thomas Kivisto ("Kivisto") for negligent misrepresentation, fraud and breach of fiduciary duty, and Doe Defendants 1 through 25.

## I.

## PRELIMINARY STATEMENT

1.     From 2004 to 2008, PwC stood watch over the meteoric rise—and catastrophic fall—of SemGroup L.P. ("SemGroup" or the "Company"), one of the largest and seemingly most successful oil and gas transportation and storage companies in Oklahoma history.  As an independent auditor, PwC owed a duty to SemGroup's limited partners to conduct its audits

according to the stringent standards mandated by the auditing profession and to ensure through its reporting that SemGroup and its partners were fully apprised of the true financial condition of the company. The proper conduct of the audits and reporting was particularly important to limited partners like Plaintiffs, who lacked the ability to conduct their own investigation into the financial activities and performance of SemGroup. PwC utterly failed in performing its duties as an independent auditor. As a result, Plaintiffs lost the full value of their limited partnership units when SemGroup declared bankruptcy in July 2008.

2.      PwC knew or should have known of serious threats to SemGroup's viability. For example, PwC knew or should have known that SemGroup's CEO, Thomas Kivisto, repeatedly engaged in related party transactions and self-dealing, using SemGroup's resources to finance his personal trading activities. As a result, by July 2008, Kivisto owed SemGroup over $290 million. Yet SemGroup's audited financial statements failed to disclose fully the nature and existence of Kivisto's debt. PwC failed to ensure that Kivisto's related party transactions and debt were adequately disclosed in SemGroup's financial statements.

3.      Further, PwC knew or should have known that Kivisto was solely responsible for SemGroup's energy options trading program, and that Kivisto's strategy carried with it a significant risk that SemGroup would be stripped of the ability to finance its operations due to capital requirements resulting from increasing margin calls and losses. PwC failed to ensure that SemGroup's consolidated financial statements adequately disclosed this risk to the Management Committee and limited partners.

4.      Had PwC done its job as an independent auditor, it would have ensured disclosure of Kivisto's inappropriate conduct and speculative trading strategy—or issued a qualified or

adverse opinion. Because it did not, Plaintiffs and other limited partners were denied the opportunity to put an end to Kivisto's activities and save SemGroup.

5.       Not only did PwC fail to alert Plaintiffs and others about these problems, Kivisto made numerous representations to Plaintiffs designed to conceal the nature of his misconduct. By way of example, notwithstanding the increasingly speculative nature and increasing capital requirements of SemGroup's trading program, Kivisto repeatedly represented to Plaintiffs that SemGroup maintained "delta neutral" trading positions. As for his personal trading, Kivisto not only represented to Plaintiffs that he was not engaging in personal trading activity (much less doing so with Company funds), he extracted millions of dollars in stock and cash from SemGroup and Plaintiffs in exchange for his commitment to forego personal trading activity. This multi-million dollar payment occurred in approximately mid-2000 when Kivisto sold his personal crude trading company, Eaglwing, to SemGroup. Kivisto induced Plaintiffs and the SemGroup Board of Directors to approve this sale by representing that, in exchange for purchasing Eaglwing, Kivisto would cease his personal trading activities. Ironically, it was Kivisto's trading that ultimately contributed to SemGroup's demise.

## II.

## PARTIES

6.       Plaintiff Cottonwood Partnership, L.L.P. is an Oklahoma limited liability company with its principal place of business in Tulsa, Oklahoma. At times relevant to this Petition, Plaintiff Cottonwoood Partnership, L.L.P. held limited partnership units in SemGroup L.P.

7.     Plaintiff Dunbar Family Partnership, L.P. is an Oklahoma limited partnership with its principal place of business in Tulsa, Oklahoma.  At times relevant to this Petition, Plaintiff Dunbar Family Partnership, L.P. held limited partnership units in SemGroup L.P.

8.     Plaintiff Rosene Family L.L.C. is an Oklahoma limited liability company with its principal place of business in Tulsa, Oklahoma.  At times relevant to this Petition, Plaintiff Rosene Family L.L.C. held limited partnership units in SemGroup L.P.

9.     Plaintiff Warren F. Kruger is an adult citizen of Oklahoma who resides in Tulsa. At times relevant to this Petition, Plaintiff Warren F. Kruger held limited partnership units in SemGroup L.P.

10.     Plaintiff Katherine A. Kruger is an adult citizen of Oklahoma who resides in Tulsa.  At times relevant to this Petition, Plaintiff Katherine A. Kruger held limited partnership units in SemGroup L.P.

11.     Plaintiff David S. Kruger is an adult citizen of Oklahoma who resides in Tulsa. At times relevant to this Petition, Plaintiff David S. Kruger held limited partnership units in SemGroup L.P.

12.     Plaintiff Kathryn E. Shelley is an adult resident citizen of Oklahoma.  At times relevant to this Petition, Plaintiff Kathryn E. Shelley held limited partnership units in SemGroup L.P.

13.     Defendant PwC is the United States member of PricewaterhouseCoopers International Limited, a UK membership-based public accounting firm.  PwC is a Delaware limited liability partnership with over 25,000 employees in offices throughout the United States, including in Tulsa, Oklahoma.  PwC partners reside in Oklahoma.  SemGroup L.P. retained PwC

to render various services in Oklahoma, including auditing SemGroup L.P.'s consolidated financial statements for the fiscal years 2004 through 2008, inclusive.

14.     Defendant Thomas Kivisto is an adult resident citizen of Oklahoma who resides in Tulsa.  At all times relevant to this Petition, Kivisto served as Chief Executive Officer of SemGroup L.P.

15.     The Doe Defendants are individuals and entities that participated in the wrongful conduct and, to the extent they did, are liable to the same extent as Kivisto.

### III.

### JURISDICTION AND VENUE

16.     Defendant PwC has offices at Two Warren Place, 6120 South Yale Avenue, Tulsa, Oklahoma, and has other substantial contacts with Oklahoma.  Certain PwC partners, including those relevant to the matters alleged herein, reside in Oklahoma.  PwC does substantial business in Oklahoma, has a substantial presence in Oklahoma, routinely provides professional services to clients—such as SemGroup—that reside in Oklahoma, and provides professional services in connection with matters that affect property in Oklahoma or that otherwise impact Oklahoma.

17.     Venue is proper against PwC and Kivisto in Tulsa County.  *See* 12 O.S. §§ 133, 137 and 187, *et seq.*

18.     . The Court has personal jurisdiction over PwC and Kivisto pursuant to 12 O.S. § 2004(F).

## IV.

## STATEMENT OF FACTS SUPPORTING RELIEF

19.     SemGroup was founded in 2000 in Tulsa.   SemGroup provided gathering, transportation, storage, distribution, marketing, and other midstream services to independent producers and refiners of petroleum products.   From 2000 through 2008, SemGroup expanded rapidly through acquisitions and capital infusions (including substantial capital infusions by the Plaintiffs), including the profits realized from a commodities trading program. By 2006, SemGroup had over $14 billion in revenues.   But, as a result of its CEO's self-dealing and speculative trading strategy, SemGroup's remarkable run came to a crashing halt in July 2008. Out of cash and facing billions in losses, SemGroup was forced to declare bankruptcy.

### PwC Served as SemGroup's Independent Auditors

20.     SemGroup engaged PwC to serve as the limited partnership's independent auditors.  The engagement commenced in 2004 and lasted through SemGroup's demise in 2008.

### 1.

### PwC's 2006 Audit

21.     On March 30, 2007, PwC issued an opinion letter to Plaintiffs titled Report of Independent Auditors ("2006 Report") related to PwC's audit of SemGroup's consolidated financial papers for the period ending December 31, 2006.

22.     In the 2006 Report, PwC explained to SemGroup's Management Committee and partners that "[a]n audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and

significant estimates made by management, and evaluating the overall financial statement presentation."

23.   PwC further advised SemGroup's Management Committee and partners that it had conducted its audits "in accordance with auditing standards generally accepted in the United States of America." And PwC confirmed its belief that "our audits provide a reasonable basis for our opinion."

24.   Based on its extensive audits, PwC concluded:   "In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations and comprehensive income, changes in partners' capital and cash flows, present fairly, in all material respects, the financial position of SemGroup, L.P. at December 31, 2006 and December 31, 2005, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America."

25.   PwC's 2006 Report contains no adverse findings, qualified opinions, or disclosures related to the extent and impropriety of Kivisto's related-party transactions and self-dealing, the risk facing SemGroup as a result of Kivisto's speculative trading policies, or the inadequacy of SemGroup's internal controls.

2.

**PwC's 2007 Audit**

26.   On March 28, 2008, PwC issued an unqualified opinion letter to Plaintiffs titled Report of Independent Auditors ("2007 Report") related to PwC's audit of SemGroup's consolidated financial papers for the period ending December 31, 2007.

27.   In its 2007 Report, PwC reiterated its statements to SemGroup's Management Committee regarding the scope of its audits.  And PwC again confirmed that its audits had been

conducted "in accordance with auditing standards generally accepted in the United States of America."

28.     As it had the year before, PwC concluded: "In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations and comprehensive income, changes in partners' capital and cash flows, present fairly, in all material respects, the financial position of SemGroup, L.P. at December 31, 2007 and December 31, 2006, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America."

29.     PwC's 2007 Report contains no adverse findings, qualified opinions, or disclosures related to the extent and impropriety of Kivisto's related party transactions and self-dealing, the capital risk facing SemGroup as a result of Kivisto's trading policies, balances owed by Kivisto, or the inadequacy of SemGroup's internal controls.

30.     PwC has since admitted that its 2007 audit opinion should no longer be relied upon.  On July 22, 2009, one year after the bankruptcy, PwC issued a letter withdrawing its March 28, 2008 opinion relating to the SemGroup Consolidated Financial Statements.

## B.

### PwC Sat Idly By as SemGroup Collapsed

31.     Notwithstanding PwC's clean audit opinions, all was not right at SemGroup.  In fact, PwC knew or should have known at the time it issued its opinions of the very facts that would ultimately bring down SemGroup.  Yet it failed to ensure that those facts were disclosed to SemGroup's limited partners, like the Plaintiffs, who might have intervened to save the company.  In fact, it was only after the bankruptcy examiner—former FBI Director Judge Louis

Freeh—completed his investigation in March 2009 that Plaintiffs' learned of the facts underlying this dispute and the potential extent of PwC's negligence.

32.     The effect of PwC's clean audit opinions was to cover up Kivisto's gross violations of company policies and lender covenants—if not criminal laws—pertaining to related party transactions and self-dealing, and to conceal the huge risk SemGroup was facing as early as December 2006 as a result of Kivisto's costly and reckless trading strategy.  PwC betrayed those limited partners and lenders who, like the Plaintiffs in this case, were relying on PwC to help ensure that SemGroup's management was playing by the rules.

1.

### Kivisto's Self-Dealing and Related Party Transactions

33.     SemGroup's CEO had repeatedly engaged in related party transactions, self-dealing, and the commingling of personal and corporate funds, all of which violated SemGroup's internal policies, lender covenants, and/or criminal laws.  Contrary to its duty as an independent auditor, PwC failed to ensure that these facts were adequately disclosed to SemGroup's Management Committee or limited partners, thus barring them from taking any action to forestall SemGroup's insolvency.

34.     Kivisto improperly placed corporate funds at risk, for his own account and personal benefit, by placing bets on the price of oil.  Kivisto, and the traders he controlled, conducted trades on behalf of, or by using, Westback Purchasing Company, L.L.C. ("Westback"), a limited liability trading company that Kivisto and his wife owned and controlled.  Such trades were made for Kivisto's personal benefit through the account of Eaglwing, a SemGroup business unit.  SemGroup essentially "fronted" the margins and margin call requirements for Kivisto's personal Westback options trades using Eaglwing.

35.    Kivisto's use of Eaglwing to as the conduit (and funding source) for his personal trades was not only improper, it was particularly egregious as SemGroup had purchased Eaglwing from Kivisto – for the express purpose of preventing Kivisto from continuing to engage in personal trading.  In approximately July 2000, Kivisto approached SemGroup's Board of Directors (which, at the time, was comprised of certain of Plaintiffs) with information related to an investor that he had located.  According to Kivisto, when this investor – Energy Spectrum – acquired an interest in SemGroup, Kivisto would be willing to cease all personal trading activities.  Kivisto explained to the Board (and certain Plaintiffs), however, that, in order for him to stop his personal trading operations, he would need to sell his company, Eaglwing, to SemGroup.  Kivisto also explained that he would require payment of approximately $5 million to divest himself of his ownership in Eaglwing.  Although $5 million was well in excess of Eaglwing's fair market value, Kivisto represented to the Board that, if SemGroup acquired Eaglwing on these terms, he would stop all personal trading activities.

36.    In reliance upon Kivisto's representations, the SemGroup Board (and certain Plaintiffs) agreed, paying Kivisto approximately $5 million in cash and stock.  As a result of this transaction, certain Plaintiffs' equity interest in SemGroup was substantially diluted.

37.    Apparently Kivisto had no intention of ceasing his trading activities, as between 2000 and 2007, a substantial number of trades were conducted on behalf of Westback in the Eaglwing account.  These trades yielded large profits for Kivisto.  For example, in 2006, Kivisto and his wife, Mrs. Julie Kivisto, had a net taxable income of approximately $26 million from Westback.

38.    In time, however, the margin call requirements on Kivisto's personal trading activities reached levels that he could no longer support.  Kivisto began racking up a bill to

SemGroup that would ultimately total over $290 million. This receivable from Kivisto was not disclosed on SemGroup's consolidated financial statements. And its existence, in the view of the examiner appointed during SemGroup's bankruptcy, affected the timing and necessity of SemGroup's bankruptcy filing.

39.     In addition to options trading, Kivisto engaged in physical commodities trades for SemGroup through Westback. Kivisto, through Westback, arranged for physical commodity transactions on behalf of Eaglwing, a SemGroup business unit, for which Eaglwing paid Westback (Kivisto) a commission. Eaglwing paid Westback approximately $4.14 million in commissions from January 2007 through July 2008 for Kivisto's physical commodities trades. However, this activity was within the scope of Kivisto's duties at SemGroup, for which he was already compensated. By conducting physical commodities trades for SemGroup through Westback, and by receiving commissions for them from Eaglwing, Kivisto improperly received additional compensation from SemGroup for the performance of his duties.

40.     SemGroup's 2006 Consolidated Financial Statements contained the following description related to SemGroup's relationship with Westback:

> The Partnership acts as agent for an entity owned by certain producer unitholders and an officer of the Partnership. Under its agency relationship, the Partnership enters into certain derivative transactions with its counterparty on behalf of the related entity. At December 31, 2006, and December 31, 2005, the Partnership recorded on the consolidated balance sheet net accounts receivable with the counterparty and a net accounts payable to the entity of $40.6 million and $8.4 million, respectively, for transactions completed during 2006 and 2005. At December 31, 2006 and 2005, the Partnership recorded on the consolidated balance sheets accounts receivable from the entity of $95.7 million and $28.2 million, respectively, related to unexpired derivative positions transacted on behalf of the entity and a corresponding derivative liability to the counterparty. There was no impact to the consolidated statement of operations and comprehensive income.

41.     The related party disclosure found in the 2006 Consolidated Financial Statements contained numerous misstatements or omissions, including:

a.  The disclosure misstates or conceals the fact that at December 31, 2006, the Westback receivable was actually $136.3 million, representing 10% of SemGroup's total accounts receivable, 3.1% of its total assets, and 37.9% of Total Partners' Capital;

b.  The disclosure fails to identify either Westback or Kivisto by name, thereby failing to provide adequate notice of the of the extent of the conflict of interest;

c.  The disclosure misstates the ownership interests in Westback by stating that the related entity was "owned by certain producer unit holders and an officer of the Partnership." In fact, Westback was wholly owned by Kivisto and his wife;

d.  The disclosure fails to disclose the scheme of financing through the Company's credit lines and crude inventory;

e.  The disclosure omits the fact that SemGroup received no security or collateral to ensure repayment. And the disclosure further omits that SemGroup did not charge interests on the amounts advanced or a financing fee; and

f.  The disclosure fails to indicate that Westback incurred the receivable to SemGroup by speculating on commodity prices, and that Kivisto's purported plan to pay back the receivable simply was to continue speculating – hopefully more successfully.

42.     SemGroup's 2007 Consolidated Financial Statements contained a similarly misleading disclosure related to the Westback relationship. That disclosure stated:

> The Partnership acts as agent for an entity owned by certain producer unitholders and an officer of the Partnership. Under its agency relationship, the Partnership enters into certain derivative transactions with its counterparty on behalf of the related entity. At December 31, 2007, the Partnership recorded on the consolidated balance sheet net accounts receivable from the entity of $68.6 million and net accounts payable to the counterparty of $72.6 million for transactions completed during 2007. At December 31, 2007 and 2006, the Partnership recorded on the consolidated balance sheets accounts receivable from the entity of $255.3 million and $95.7 million, respectively, related to unexpired derivative positions transacted on behalf of the entity and a corresponding derivative liability to the counterparty. There was no impact to the consolidated statement of operations and comprehensive income.

43.     The 2007 disclosure contained the same misstatements and omissions found in the 2006 disclosure. The effect, however, was only exacerbated by the fact that the Westback receivable had increased by nearly $200 million in 2007 alone, representing 18% of SemGroup's total accounts receivable, 4.8% of its total assets, and 94.6% of the negative Total Partners' Capital.

44.     A reasonable auditor exercising professional skill and judgment would have detected the misstatements and omissions in the related party disclosures and would have demanded correction or noted such misstatements and omissions in its report. PwC failed to do so.

**2.**

**Kivisto's Untenable Trading Strategy**

45.     Prior to 2006, significant portions of SemGroup's income were realized from its energy options trading program. As SemGroup's independent auditor, PwC had a duty to investigate this trading activity, understand its scope, determine its effect on credit facilities, and assess any risks posed by the activity to SemGroup's ability to continue as a going concern.

46.     As early as 2005, Kivisto had embarked on a trading strategy that carried significant risks to the viability of the Company. This trading strategy was completely unknown to Plaintiffs. In fact, Kivisto represented to Plaintiffs on repeated occasions that SemGroup's trading positions were always "delta neutral" and that SemGroup "closed its positions in its trading books every day." By way of example, Kivisto made these representations to Plaintiffs during shareholders' meetings, "informative unitholder meetings," and other meetings – both formal and informal. These meetings (and attendant representations by Kivisto) occurred in 2000, 2001, April 25, 2002, September 18, 2002, July 17, 2003, December 14, 2004, and later.

47.     Kivisto concealed from Plaintiffs not only the existence of his personal trading (and the fact that it was being funded by SemGroup), but the capital requirements and the funding scheme of the Company's trading strategy. Rather than informing Plaintiffs about SemGroup's trading exposure, the attendant risks and the funding of Westback, Kivisto sought to encourage Plaintiffs to continue pouring their personal funds into SemGroup. Plaintiffs relied upon Kivisto's representations regarding the financial health and stability of SemGroup, and contributed millions of dollars to SemGroup through capital contributions made on or about: December 19, 2000, November 14, 2002, December 16, 2003, January 2005, and May 26, 2006.

48.     Kivisto was particularly aggressive in his efforts to induce Plaintiffs to make their 2006 capital contributions. While these capital contributions were not mandatory, if a shareholder elected not to contribute, his equity in SemGroup would be reduced. On or about May 25, 2006, during a lunch meeting at Southern Hills Country Club, Kivisto approached certain of the Plaintiffs and made several statements clearly intended to induce them to make these capital contributions. As this lunch meeting occurred roughly a day before a capital contribution deadline, Kivisto informed Plaintiffs: "you've got 24 hours to get your money in."

Kivisto went on to explain "you don't want to miss this one." Kivisto repeatedly emphasized to Plaintiffs that failing to make the capital contribution would cause Plaintiffs substantial financial loss due to his view that the value of their SemGroup shares would increase substantially in the near term. Of course, Kivisto neglected to disclose the nature of the Company's and Westback's trading programs or the ever-increasing Westback receivable. Unaware of these facts and relying upon Kivisto and PwC's role as auditor, Plaintiffs contributed several million dollars to SemGroup shortly thereafter.

49.     SemGroup's consolidated financial statements for 2006 and 2007 failed to adequately disclose the risk and funding attendant to Kivisto's trading activities. By failing to ensure an adequate disclosure, PwC permitted SemGroup to enter a liquidity crisis in 2008 from which it was unable to recover. Had SemGroup's limited partners, including Plaintiffs, been fully apprised of the risks involved in the trading program, they could have taken steps to curtail the activity and prevent disaster.

50.     Kivisto personally directed or controlled SemGroup's trading activity from 2000 to 2008. SemGroup's internal policies permitted "hedging" to reduce the risks created by fluctuations in the price of oil and gas products that SemGroup stored and transported. When hedging, SemGroup bought and sold derivative agreements that enabled it to sell the oil it expected to store or transport in the future at a specified price. Hedging is designed to manage the risk of price fluctuations (and is not viewed as a profit/loss center), not necessarily to profit on that risk.

51.     During the early years of SemGroup's existence, Kivisto appears to have adhered to SemGroup's policies and to have engaged in classic hedging. By approximately 2005, however, Kivisto had embarked on an extremely costly trading strategy designed to profit

through buying and selling options. Kivisto based the strategy on his belief that oil prices would always return to a normalized price range around $75 per barrel. As oil prices increased, however, Kivisto's capital-intensive trading activities began to monopolize, and eventually overtook, the Company's capital resources. By 2006, Kivisto's trading activities were not tied entirely to SemGroup's actual or anticipated inventories, as required by SemGroup's internal policies and lending covenants. Instead, Kivisto entered option contracts without expecting to have the oil subject to the agreements on hand. Under such agreements, Kivisto would bind SemGroup to sell oil in the future based on the current price, betting that the price of oil would fall in the future. If the bet was successful, SemGroup could perform under the agreements by purchasing oil at the lower price on the market and reselling under the agreements at the higher stated price.

52.     Sometimes, of course, bets on the market are not successful. This was particularly the case in 2006 and 2007 as oil prices steadily increased and the market experienced significant volatility. Kivisto's trading strategy did not allow for unsuccessful bets that resulted in options trading losses. Rather, options positions that neared expiration with a Mark to Market ("MtM") loss would be reset, or "rolled forward," with the anticipation that the price of oil would eventually return to a "normal" price range. Kivisto's goal was to increase trading revenue through the sale of options and to prevent the realization of losses arising from options sales through the sale of more options. In essence, Kivisto "bet" that the price of oil would return to a more normal trading range, and that the unrealized losses associated with the "rolled forward" trades would eventually expire worthless. But the anticipated return of the price of oil to a "normal" range did not occur before the margin costs consumed SemGroup's available cash and credit.

53.     As early as 2005, Kivisto increasingly resorted to buying and selling "naked options," in part to cover for his unsuccessful trades. "Naked options" are options that are not matched against physical inventory or an offsetting trading position. The fact that the options were not backed by physical inventory or offset by another open trade exposed SemGroup to significant risk, which only increased in 2006 and 2007. The reason is straightforward. If SemGroup entered into a "covered" option contract—one that was matched against a barrel of oil SemGroup would have in its inventory in the future—SemGroup could perform under the option contract by simply delivering the barrel of oil in its inventory without incurring any additional expense, no matter how much the price of oil had increased in the future. If, however, SemGroup entered into a "naked" option contract requiring SemGroup to sell a barrel of oil for $100 per barrel in the future without having that barrel of oil in inventory, and if the price of oil rose to $130 per barrel, SemGroup would have to purchase the barrel of oil on the market at $130 to perform under the option contract. In so doing, it would suffer a $30 loss on the transaction.

54.     As SemGroup's "rolled forward" trading positions and its unrealized losses increased, and as the price of oil and volatility of the price of oil increased, the margin requirements it needed to pay to maintain its trading accounts also increased. By the fall of 2007, SemGroup was forced to rob profitable operating divisions to meet its margin requirements. Kivisto stripped profitable divisions of their capital to meet margin calls, in so doing jeopardizing those divisions' ability to meet operating capital demands. In addition, Kivisto shifted options trading losses to the operating divisions' books, without the knowledge of the divisions or their managers. SemGroup was also forced to increasingly rely on its credit facilities. Eventually, SemGroup was unable to service the margin calls. By early July 2008,

SemGroup advised its lenders that it needed to use all of its credit capacity. Last minute attempts by it to increase its credit facility failed. SemGroup's total trading losses exceeded $3 billion.

55. The 2006 and 2007 Consolidated Financial Statements addressed to Plaintiffs contained material misstatements concerning the speculative nature of Kivisto's trading strategy and the associated risks. SemGroup's financial statements and related reports represented that Kivisto's commodity trading activity was designed to reduce risks. For example, the Management's Discussion and Analysis of Financial Condition and Results of Operation Report ("MD&A"), to be read in conjunction with the SemGroup 2006 Consolidated Financial Statements stated that "We seek to maintain a neutral net purchase and sale position and minimize exposure to commodity prices[,]" and SemGroup's 2006 and 2007 Consolidated Financial Statements stated that SemGroup "utilizes various derivative instruments to . . . manage exposure to commodity price risk."

56. The MD&A, to be read in conjunction with the SemGroup 2007 Consolidated Financial Statements, stated that: "We seek to maintain a neutral net purchase and sale position and minimize exposure to commodity prices. Our commodity price risk management policy dictates that all derivative transactions entered into must offset our inventory and other risk positions. Speculative transactions in commodities are not permitted."

57. Furthermore, SemGroup's Condensed Consolidated Guarantor Financial Statements (Unaudited) As of December 31, 2007 and 2006 stated that "[t]o mitigate the Partnership's physical product and inventory exposure to adverse market changes, the Partnership enters into various derivative transactions."

58. The foregoing statements in SemGroup's 2006 and 2007 Consolidated Financial Statements misrepresent the nature of and risks associated with Kivisto's trading strategy. The

statements are misleading and incorrect in at least three aspects: (1) they state unequivocally that SemGroup's trading activities were designed to reduce risk, when in fact the trading activities necessarily increased SemGroup's risks by orders of magnitude; (2) the statements intimate that SemGroup's trading activities were tied to actual or anticipated inventory, when in fact Kivisto was increasingly turning to the use of naked options; and (3) the statements convey the message that SemGroup was adhering to internal policies when conducting trades, when in fact Kivisto's strategy violated SemGroup policies and lender covenants. Further, these statements include no mention of the Company's funding of Westback.

59.     In rendering its opinion, a reasonable auditor would have analyzed SemGroup's trading and inventory records, as well as SemGroup's internal trading policies and lender covenants. A proper analysis of such records would have revealed that Kivisto's massive trading operation increased, rather than reduced, SemGroup's risks. A proper analysis also would have revealed that Kivisto's trading strategy violated SemGroup policies and covenants. A reasonable auditor would have investigated Kivisto's trading strategy, analyzed the risk associated with the strategy, and demanded that misstatements in the 2006 and 2007 Consolidated Financial Statements be corrected before issuing an unqualified opinion. Likewise, a reasonable auditor would have revealed the source of funding and impact on the Company's lenders and credit facilities. PwC failed to do so. As a result, Plaintiffs and other limited partners were left in the dark as SemGroup hurtled toward insolvency.

**3.**

### PwC Possessed Full Knowledge Regarding the
### Westback Relationship and Transactions

60.     PwC had full knowledge of the Westback arrangement Kivisto devised with
SemGroup. PwC was aware of the relationship at least as early as 2006, and under professional
standards was required to act on that knowledge. On information and belief, in early 2006, PwC
was advised by Kathy Lewallen, Controller for SemGroup subsidiary SemCrude L.P., that an
outside entity (Westback), which operated from Kivisto's administrative assistant's office, was
being permitted to trade through a subsidiary of SemGroup (Eaglwing). Also on information and
belief, due to her concerns about the unusual relationship between SemGroup and Westback,
Lewallen took action to make sure that the Westback relationship was known to PwC. In
addition, PwC had received a copy of an agreement dated March 20, 2006, signed by Kivisto,
Westback and Eaglwing, confirming their understanding that Eaglwing was entering into trading
contracts as "Westback's authorized agent and representative, and all obligations and benefits
under [such] [c]ontracts shall be for the sole account of Westback."

61.     PwC knew or should have known that the details of this arrangement – including
that it was the equivalent of an interest-free, unsecured, unlimited line of credit for Kivisto –
would be material to Plaintiffs and other users of the SemGroup Consolidated Financial
Statements.   Further, an auditor with such knowledge, exercising reasonable skill and
professional judgment, would have recognized the great risks that this arrangement presented to
SemGroup and Plaintiffs, and taken steps to audit accordingly. Despite that knowledge, PwC
failed to take appropriate steps to examine the Westback relationship, and failed to ensure that
Kivisto made full and accurate disclosure of the arrangement in SemGroup's financial
statements. PwC had a duty to convey material weaknesses (such as this) to SemGroup's Audit

and Risk Management Committees – yet PwC failed to do so in accordance with their professional responsibilities.

## V.

## CLAIMS FOR RELIEF

## COUNT ONE: PROFESSIONAL NEGLIGENCE

### (Against PwC)

62.     Paragraphs 1 through 61 are hereby incorporated by reference.

63.     Defendant PwC owed Plaintiffs a duty of due care to render professional accounting and audit services with reasonable professional skill and judgment, as measured by the standards of care in the industry, which are reflected in part in the formalized standards adopted by the American Institute of Certified Public Accountants and other organizations, *i.e.* GAAS and GAAP, as well as the statutory and regulatory provisions that govern the provision of accounting and audit services in Oklahoma.

64.     Defendant PwC owed Plaintiffs the highest duty of care, as Plaintiffs were known and foreseeable users of the financial statements and other information that PwC examined, audited, and validated.  Moreover, Plaintiffs fall within the group of individuals and entities for whose guidance PwC intended to supply the audit data.

65.     PwC breached the duty of care it owed to Plaintiffs by violating the applicable standards of care throughout the course of planning and conducting its audits and preparing its reports.

66.     As a natural, direct, and proximate result of PwC's breach of its duties, Plaintiffs did not and could not learn of the threat posed by Kivisto's trading activity to SemGroup L.P.'s ability to continue as a going concern, the lack of internal financial controls, and the existence

and extent of Kivisto's related party transactions and self dealing.  Had PwC complied with the professional standard of care, PwC would have necessarily issued a qualified or adverse opinion regarding SemGroup's ability to continue as a going concern, the failure to implement necessary internal controls, and the existence and scope of Kivisto's related party transactions and self-dealing.  One or more of Plaintiffs would have then learned of Kivisto's harmful conduct, and would have intervened to stop it long before the Company's demise.

67.     Plaintiffs were injured by PwC's professional negligence and suffered damages in an amount to be determined according to proof at trial but well in excess of $10,000.

68.     Furthermore, PwC acted with a wanton or reckless disregard for Plaintiffs' rights. Therefore, Plaintiffs should be awarded punitive damages in an amount sufficient to deter future wrongdoing.

## COUNT TWO: VIOLATION OF THE OKLAHOMA ACCOUNTANCY ACT

### (Against PwC)

69.     Paragraphs 1 through 68 are hereby incorporated by reference.

70.     The Oklahoma Accountancy Act, 59 O.S. §§ 15.1 et seq., provides that an accountant may be penalized for committing or engaging in "[d]ishonesty, fraud, or gross negligence in accountancy or financially related activities." 59 O.S. § 15.14(B)(2).

71.     Under Oklahoma law, an accountant is also subject to penalty for failing to comply with professional standards set forth in the Oklahoma Accountancy Board's professional code of conduct. *Id.* § 15.14B(5).

72.     Further, an accountant may be penalized for violating "any of the provisions of the Oklahoma Accountancy Act and rules promulgated for its implementation by the [Oklahoma Accountancy] Board." *Id.* § 15.14B(6).

73.    The Oklahoma Accountancy Board has adopted rules stating that it is "professional misconduct for a CPA . . . or a firm to . . . commit any act that reflects adversely on the CPA's . . . fitness to practice public accounting" or to "engage in conduct involving dishonesty, fraud, deceit, misrepresentation or omission of a known material fact." OK. ADMN. CODE §10:15-39-9(3) and (4).

74.    PwC violated the standards set forth in these statutes and regulations in the course of planning and conducting its audits and preparing its reports.

75.    In performing the audits and examinations of SemGroup, PwC failed to perform its services according to these statutory and regulatory requirements, resulting in harm to Plaintiffs.

76.    As a natural, direct, and proximate result of PwC's breach of its duties, Plaintiffs did not learn of the threat posed by Kivisto's trading activity to SemGroup L.P.'s ability to continue as a going concern, the lack of internal financial controls, and the existence and extent of Kivisto's related party transactions and self dealing until many months after SemGroup L.P. sought bankruptcy protection in July 2008.   Had PwC complied with the above-referenced statutory provisions and the professional standard of care, PwC would have necessarily issued a qualified or adverse opinion regarding SemGroup's ability to continue as a going concern, the failure to implement necessary internal controls, and the existence and scope of Kivisto's related party transactions and self-dealing. One or more of Plaintiffs would have then learned of Kivisto's harmful conduct, and would have intervened to stop it long before July 2008.

77.    Plaintiffs were injured by PwC's failure to adhere to these statutory and regulatory requirements and suffered damages therefrom in an amount to be determined at trial but well in excess of $10,000.

78.     Furthermore, PwC acted with a wanton or reckless disregard for Plaintiffs' rights. Therefore, Plaintiffs should be awarded punitive damages in an amount sufficient to deter future wrongdoing.

## COUNT THREE: NEGLIGENT MISREPRESENTATION

### (Against Kivisto)

79.     Paragraphs 1 through 78 are hereby incorporated by reference.

80.     Kivisto made representations to Plaintiffs (and/or concealed material facts that he had a duty disclose to Plaintiffs) in the course of business and/or in connection with a transaction in which Kivisto had an interest. Kivisto supplied false information for the guidance of others, including Plaintiffs. This false and/or misleading information includes, but is not limited to, (a) the information (or lack thereof) concerning the "related party transactions" between SemGroup and Westback; (b) the nature and identity of Westback's owners; (c) Kivisto's use of SemGroup assets for trading and investment activities undertaken for his own personal gain; (d) the amount and existence of the Westback receivable owing to SemGroup; (e) Kivisto's financial and/or managerial role in various entities unrelated to SemGroup, but to which Kivisto devoted substantial time and attention; (f) the existence of Kivisto's self-interest in certain companies that he directed SemGroup to enter into agreements with; (g) that Kivisto had continued and ongoing involvement in speculative trading and investment activities on behalf of SemGroup and for his own personal account; and (h) that SemGroup closed its trading books every day and that its trading position was always "delta neutral."

81.     Kivisto acted negligently or otherwise failed to exercise reasonable care or competence in obtaining and communicating (or in failing to communicate) the information. Plaintiffs justifiably relied upon Kivisto's misrepresentations and omissions. Plaintiffs' reliance

upon Kivisto's misrepresentations and nondisclosures is illustrated, in part, by the millions of dollars Plaintiffs paid to SemGroup in the form of capital contributions.  Plaintiffs made these capital contributions in 2000, 2002, 2003, 2005, and 2006.

82.     Plaintiffs suffered substantial damages as the direct and proximate result of Kivisto's misconduct, and are entitled to an award of damages in an amount to be determined at trial but well in excess of $10,000.

COUNT FOUR: FRAUD

(Against Kivisto)

83.     Paragraphs 1 through 82 are hereby incorporated by reference.

84.     Kivisto misrepresented material facts to Plaintiffs and/or concealed material facts that he had a duty disclose to Plaintiffs.  These material facts include, but are not limited to (a) the information (or lack thereof) concerning the "related party transactions" between SemGroup and Westback; (b) the nature and identity of Westback's owners; (c) his use of SemGroup assets for trading and investment activities undertaken for his own personal gain; (d) the amount and existence of the Westback receivable owing to SemGroup; (e) Kivisto's financial and/or managerial role in various entities unrelated to SemGroup, but to which Kivisto devoted substantial time and attention; (f) the existence of Kivisto's self-interest in certain companies that he directed SemGroup to enter into agreements with; (g) that he had continued and ongoing involvement in speculative trading and investment activities on behalf of SemGroup and for his own personal account; and (h) that SemGroup closed its trading books every day and that its trading position was always "delta neutral."

85.     Upon making these misrepresentations, Kivisto knew the statements were false, or made such statements as positive assertions recklessly, and without any knowledge of their truth.

Kivisto concealed these material facts with the intention of creating a false impression in the mind of Plaintiffs.   Kivisto misrepresented and/or concealed these material facts with the intention that Plaintiffs would act upon them or with the intention to induce Plaintiffs not to take action.

86.     Plaintiffs acted and/or forewent certain actions in reliance upon Kivisto's misrepresentations and omissions.   Plaintiffs' reliance upon Kivisto's misrepresentations and nondisclosures is illustrated, in part, by the millions of dollars Plaintiffs paid to SemGroup in the form of capital contributions.   Plaintiffs made these capital contributions in 2000, 2002, 2003, 2005, and 2006.   Plaintiffs suffered substantial damages as the direct and proximate result of Kivisto's wrongful acts.

87.     To the extent any of Kivisto's misrepresentations may be construed as relating to future events, acts, or promises, Kivisto made these misrepresentations knowingly and without the intent to carry out the stated acts and intentions, and with the intent to deceive Plaintiffs into acting where they otherwise would not have done so.

88.     Plaintiffs suffered substantial damages well in excess of $10,000 as the direct and proximate result of Kivisto's wrongful acts.

89.     Plaintiffs are entitled to an award of damages in an amount to be determined at trial.

## COUNT FIVE: BREACH OF FIDUCIARY DUTY

### (Against Kivisto)

90.     Paragraphs 1 through 89 are hereby incorporated by reference.

91.     Kivisto owed Plaintiffs fiduciary duties including, but not limited to, the duties of care, loyalty, utmost good faith and fair dealing, accountability and disclosure.   These duties

arose due to the relationship between Kivisto and Plaintiffs, due to the trust and confidence reasonably placed by Plaintiffs in the integrity and loyalty of Kivisto. Kivisto knowingly accepted that trust and confidence. This fiduciary relationship existed as a result of the position Kivisto held with SemGroup, the influence Kivisto possessed as a result of that position, the length and nature of Kivisto's relationship with Plaintiffs, and/or the trust and confidence Plaintiffs placed in Kivisto, among other factors.

92. Kivisto breached these duties owed under the law to Plaintiffs. Plaintiffs suffered damages as the actual and proximate result of Kivisto's breach of fiduciary duties.

93. Plaintiffs are entitled to an award of damages in an amount to be determined at trial but well in excess of $10,000. Plaintiffs are further entitled to recover punitive damages in an amount to be proven at trial, to deter such wrongdoing in the future.

## VI.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief from the Defendants:

1. Compensatory damages for all damages in excess of $10,000 sustained as a result of Defendants' wrongdoing, in an amount to be proved at trial, including interest thereon;

2. Punitive damages;

3. Reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

4. Such other and further relief as the Court may deem just and proper.

## VIII.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

James W. Rusher, OBA #11501
Albright, Rusher & Hardcastle, P.C.
2600 Bank of America Center
15 W. 6th Street
Tulsa, Oklahoma 74119
Tel.: 918.583.5800
Fax: 918.583.8665

Adam P. Schiffer
Andrew S. Hicks, OBA # 21468
Logan E. Johnson
Schiffer Odom Hicks & Johnson PLLC
3200 Southwest Freeway, Suite 2390
Houston, Texas 77027
Tel.: 713.357.5150
Fax: 713-357-5160

**Counsel for Plaintiffs**

## IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
## STATE OF OKLAHOMA

COTTONWOOD PARTNERSHIP, L.L.P.,    )
DUNBAR FAMILY PARTNERSHIP, L.P.,    )
ROSENE FAMILY L.L.C.,    )
WARREN F. KRUGER, KATHERINE A.    )
KRUGER, DAVID S. KRUGER, AND    )
KATHRYN E. SHELLEY,    )
                                       )
           Plaintiffs,    )     Case No.
                                       )
vs.    )
                                       )
PRICEWATERHOUSE COOPERS, LLP,    )
THOMAS KIVISTO, AND JOHN DOES 1-25    )
                                       )
          Defendants.    )     JURY TRIAL DEMANDED

### Affidavit of Logan E. Johnson

Logan E. Johnson, as counsel for Plaintiffs, declares as follows pursuant to 12 O.S. § 19:

      1.    My name is Logan E. Johnson.  I am over the age of twenty-one, and am competent to make this affidavit.  I am counsel for Plaintiffs Cottonwood Partnership, L.L.P., Dunbar Family Partnership, L.P., Rosene Family L.L.C., Warren F. Kruger, Katherine A. Kruger, Davis S. Kruger, and Kathryn E. Shelley.  I have consulted and reviewed the facts of the claim set forth in the attached petition against PricewaterhouseCoopers, LLP with a qualified expert.

      2.    I have obtained a written opinion from a qualified expert that clearly identifies the Plaintiffs and includes his determination that, based upon a review of the available material including, but not limited to, applicable records, facts or other relevant material, a reasonable interpretation of the facts supports a finding that the acts or omissions of Pricewaterhouse Coopers, LLP constituted professional negligence.

      3.    On the basis of the review and consultation of a qualified expert, I have concluded that the Plaintiffs' claim is meritorious and based upon good cause.

      I declare under penalty of perjury that the foregoing is true and correct.

Dated this 21st day of December 2010, at Houston, Texas.

                                            Logan E. Johnson
                                          Counsel for Plaintiffs